IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN (WATERLOO) DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 21-CR-2020 |
| Plaintiff, | |
| vs. | |
| JOSHUA WILLIAM BUTLER, | DEFENDANT'S MOTION FOR DOWNWARD VARIANCE AND SENTENCING MEMORANDUM |
| Defendant. | |

Joshua William Butler, through counsel, hereby submits the following motion for downward variance and sentencing memorandum.

### I. Witnesses

Defendant does not anticipate calling any witnesses at the sentencing hearing.

### II. Exhibits

Defendant anticipates submitting the following exhibits at the sentencing hearing:

A. Support letter from Sarah Alexander.

B. Support letter from Natalie Martin.

C. Support letter from Monetta Brooks.

D. Support letter from Trenity Butler.

E. Support letter from Lenise Butler.

F. Support letter from Brett Wilcox.

G. Support letter from Nathan Droste.

H. Support letter from Wylicia Cobbs.

I. Support letter from Chantell Putnam.

1

J.       Support letter from J.B.

K.      Support letter from Tierra Butler.

L.       ATF Report labeled 21MJ08_SW_RESIDENCE-000041.

M.     Photo of magazine.

N.     Photos of gun case.

O.      ATF Receipt for Property labeled 21MJ08_SW_RESIDENCE-000043.

P.       ATF Report labeled RPTS_ATF-000032.

Q.      DCI Lab Report labeled LABS_DCI-000003.

R.      Photo of marijuana and paraphernalia.

## III. Issues

The Final Presentence Investigative Report (PSR) identified the following issues as requiring the Court's resolution: 1) whether the offense involved a semi-automatic firearm that is capable of accepting a large capacity magazine; 2) whether the offense involved the possession of a firearm in connection with possession of marijuana and/or amphetamines with the intent to deliver; and 3) whether to vary downward, pursuant to 18 U.S.C. § 3553(a). Docket No. 35.

    A. The Offense Did Not Involve A Semi-Automatic Firearm Capable Of Accepting A Large Capacity Magazine.

The Defendant objects to application of USSG §2K2.1(a)(4)(B). PSR ¶ 22. Probation defends the enhancement by writing that a 33-round magazine was found in the same master bedroom closet as a firearm capable of accepting it. Id. The discovery materials, however, demonstrate that where exactly the 33-round magazine was found in relation to the semi-automatic firearm is less than clear. Exhibit L.

Law enforcement authored two inventory reports of items seized from the Defendant's residence. Id. Item Number 10 is listed as a 33 round magazine. Id. It appears to have been

found by agent "RC." Id. The description of the item indicates that it was found on a shelf in the closet of the North, first floor bedroom, in packaging. Id. Item Number 7, which also appears to have been found by agent "RC," is a Glock 19 Generation 5 9 millimeter pistol (Glock 9 mm), the supposed "semi-automatic firearm capable of accepting a large capacity magazine." Id. But, the Glock 9 mm, which was also found by "RC," is listed as being found under some clothes on a shelf in the master bedroom closet. Id. That one bedroom is listed as the "master," and that another bedroom is listed as the "north" first floor bedroom strongly suggests that the 33-round magazine was found in a different bedroom than the Glock 9 mm. As such, the 33-round magazine, which was still in its original packaging, PSR ¶ 14, was not in close proximity to the Glock 9 mm.

Even if the Court finds that the magazine and Glock 9mm were found in the same closet, the circumstances of their discovery do no support finding that the two were in "close proximity" within the meaning of §2K2.1(a)(4)(B). Assuming that the magazine and gun case were found in the same bedroom closet, there appears to be spatial and temporal proximity. That written, there does not appear to be any other relationship between the two items. First, the magazine was still in its original packaging. Exhibit M. Second, the Glock 9mm was in its gun case with its own 15 round magazine. Exhibit N; PSR ¶ 14. The word "proximity" refers not just to the four dimensions but to connection.[1] Because the Glock 9mm was encased with its own magazine, the 33-round magazines (possible) presence in the same closet was coincidence. That the 33-round magazine was in its original packaging, and obviously unloaded entrenches the reality that its only relationship to the Glock 9 mm was spatial and temporal.

> B. The Defendant Did Not Possess A Firearm In Connection With Dealing Amphetamine Or Marijuana.

As noted by Probation, the Defendant voided a urine sample positive for amphetamines

---

[1] https://www.merriam-webster.com/dictionary/proximity

and marijuana. PSR ¶ 17. The PSR further reflects that the Defendant is a heavy user of marijuana and user of amphetamines. PSR ¶¶ 54-55. Moreover, as the purity or strength of the pills (and therefore the dosage) are unknown, the number of pills (approximately 60) is arguably consistent with personal use. Further, that the pills appear to have all been found in a white plastic jar is inconsistent with storage for the purpose of distribution. Exhibit O. Indeed, that the pills were all in a single container is entirely consistent with use by a single user; that is, there is no need for a single user to package their pills separately because they simply reach their hand into the container to help themselves to what they want to use.

The PSR writes that approximately 650 grams of marijuana were found in the Defendant's residence. PSR ¶ 14. The Defendant denied that the actual weight of the marijuana (without packaging) was 650 grams. Docket No. 33. But, how much less would the marijuana weigh without packaging? Unfortunately, discovery materials do not include a lab report regarding the actual weight of the marijuana. It is informative though that while the pills (as packaged) weighed 114 grams, the actual weight of the pills (without packaging) was only 23.17 grams. Exhibits P and Q. That's an 80% haircut off the top!

The marijuana with packaging weighed 646 grams. Exhibit P. It makes sense to shave at least 80% off that weight. Why? Because the marijuana was mostly contained in glass jars! Exhibit R. Assuming that the marijuana weighed even 20% off, the gross results in only 129 grams of marijuana. The Defendant is a heavy user of marijuana. PSR ¶ 54. He used marijuana three to four times per week. Id. He also appears to roll the marijuana into blunts. Exhibit R. Rolling blunts is the least efficient method of marijuana consumption.[2] What's more is that the

---

2

https://weedmaps.com/learn/products-and-how-to-consume/how-to-conserve-weed#:~:text=Joints%20and%20blunts%20are%20the,going%20into%20a%20single%20experience.

packaging of the marijuana, while technically separate, is not so separated as to be inconsistent with personal use.

> C. The Court Should Vary Downward Regardless Of How The Court Rules On The Above Objections.

A downward variance is appropriate regardless of whether the Court sustains only the Defendant's objection to the base offense level (resulting in a total offense level of 25, and an advisory range of 63 to 78 months), sustains only the Defendant's objection to §2K2.1(b)(6)(B) (resulting in a total offense level of 26, and an advisory range of 70 to 87), sustains both of the Defendant's objections (resulting in a total offense level of 21, and an advisory range of 41 to 51 months), or overrules both of the Defendant's objections.

In the event that the Court overrules the Defendant's objection to the base offense level, a downward variance is appropriate because the six additional levels produces a greater than necessary guideline range. Large capacity magazines make firearms more dangerous. But, there is a difference between someone carrying a firearm with a 33-round magazine out into the world, and someone possessing an encased firearm in the same closet as a large capacity magazine in its original packaging. The former is much more dangerous. It follows that that offender is much more culpable. Perhaps, the guidelines intended to apply the greater base offense level to the Defendant, but he denies that § 3553(a) requires him to be treated as harshly as the offender who goes out in public carrying a firearm with a 33-round magazine affixed to it.

Relatedly, should the Court overrule the Defendant's objection to §2K2.1(b)(6)(B), he respectfully asserts that its application tends to overstate the seriousness of his conduct. The Defense is mindful that guns are tools of the drug trade and the broad interpretation of §(b)(6)(B), §2K2.1, comment. (n. 14(B)), but the assessment of four levels based on the possession of a single encased, unloaded, firearm within the same bedroom as the supposed distribution-level of

5

marijuana is less a reflection of the Defendant's culpable conduct, than it is a function of the guidelines' intent to be over-inclusive when it comes to guns and drug dealing.

The Defendant's criminal history also favors a downward variance. He is 35 years old, and has only two convictions. PSR ¶¶ 34-35. While the first is admittedly for an OWI, the second is for a driving offense punished by only a fine. Id. Even accounting for the serious potential that all OWIs carry, the Defendant's OWI offense appears to be a run-of-the-mill OWI without any aggravation. PSR ¶ 35. His OWI netted him two criminal history points because he violated his probation. Again, not a good thing. But, the violations don't appear to rise to the level typically associated with a 75-day sentence. But for the higher than expected punishment for violating his OWI probation, the Defendant would be in criminal history category I.

Of course, the Court could speculate about the motives behind the Defendant's numerous firearm purchases. On the other hand, the record does not support finding any kind of motivation held by the Defendant. And, the enhancement for number of firearms and obliterated serial number adequately account for the seriousness of the Defendant's conduct.

Most importantly, the Defendant's personal history and characteristics strongly support a downward variance. As serious as the Defendant's conduct might be, the Defendant has assuaged concerns regarding the decisions that led to his offense through his performance on pretrial release. See PSR ¶ 3. Other than a driving violation, the Defendant has performed admirably on pretrial release. Expected or not (and it was not given the Defendant's substance abuse history), a virtual clean sheet on this Court's pretrial release shows that the Defendant is not only remorseful for his conduct, but willing and able to succeed outside the four walls of the Bureau of Prisons and within the confines of Court supervision.

The Defendant's employer writes that the Defendant:

> "has displayed a great work ethic and positive attitude. There was no question what so ever as to; if he would be hired on in a full time capacity. He has worked hard to prove himself and has done a great job complying with any requests made of him. He works well with all of his coworkers and I have never received a single complaint about him, which says a lot considering the high stress environment we operate in. His attendance is impeccable and he is usually the first of my employees to accept overtime when given the opportunity." Exhibit G.

More impressive is that the employer has " high expectations for Josh and expect to see him move up more within the company or move on to better things with another company." Id. But, most impressive is that when the Defendant was confronted in an unfair manner by a supervisor, he "used the chain of command to address the situation" and the situation was "resolved the amicably." Id. The employer wishes "that all of my employees would demonstrate his level of maturity when dealing with conflict." This kind of accountability, which is predictive of success on supervised release, is what Courts should look for when determining whether a defendant should be released sooner rather than later from prison.

Equally important is that the Defendant's conduct ceased on January 22, 2021 with the intervention of law enforcement. PSR ¶ 15. From that time on, he had no interactions with law enforcement. He did not need to. He got back to work in February (working at Tyson's), and continued to work until he was arrested on the instant case. PSR ¶ 59; Docket No. 15. Indeed, following the instant conduct, the Defendant enjoyed his second-highest earnings year. PSR ¶ 60. This may be a defendant who must be punished through imprisonment, but the Defendant is not someone who requires more deterrence.

The Defendant respectfully submits that the Court vary downward to a sentence not greater than necessary to achieve the goals of § 3553(a).

## IV. Conclusion

For the above reasons, the Defendant requests that the Court sustain his objections and vary downward.

FEDERAL DEFENDER'S OFFICE
222 Third Avenue SE, Suite 290
Cedar Rapids, IA 52401-1509
TELEPHONE: (319) 363-9540
TELEFAX: (319) 363-9542

BY: /s/ Christopher J. Nathan
CHRISTOPHER J. NATHAN
christopher_nathan@fd.org
ATTORNEY FOR DEFENDANT

CERTIFICATE OF SERVICE
I hereby certify that on November 2, 2022, I electronically filed this document with the Clerk of Court using the ECF system which will serve it on the appropriate parties.

By: /s/ Melissa Dullea